People v Johnson (2021 NY Slip Op 04162)





People v Johnson


2021 NY Slip Op 04162


Decided on July 1, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:July 1, 2021

110820

[*1]The People of the State of New York, Respondent,
v
Angelo Johnson, Appellant.

Calendar Date:May 27, 2021

Before: Lynch, J.P., Clark, Aarons and Colangelo, JJ.


Carolyn B. George, Albany, for appellant.
Meagan K. Galligan, District Attorney, Monticello (Lisa Marie Bondarenka of counsel), for respondent.


Lynch, J.P.
Appeal from judgment of the County Court of Sullivan County (LaBuda, J.), rendered September 7, 2018, upon a verdict convicting defendant of the crime of burglary in the second degree.
Defendant was charged by indictment with burglary in the second degree in connection with the theft of property from an inn located in Sullivan County on the morning of November 6, 2016. During defendant's arraignment, the People moved to amend the indictment, revealing that they had mistakenly cited the Penal Law provision pertaining to reckless endangerment of property and clarifying that they intended to cite Penal Law § 140.25 (2), the statutory provision for burglary in the second degree. County Court granted the People's motion, but the amended indictment again cited the wrong Penal Law section, referencing the provision for criminal tampering in the first degree.
Defendant subsequently filed an omnibus motion seeking, among other things, inspection of the grand jury minutes, dismissal of the indictment [FN1] and suppression of certain statements he had made to law enforcement. Upon an in camera inspection of the grand jury minutes, County Court denied defendant's motion to dismiss the indictment — finding no irregularities or illegalities in the grand jury proceedings — but granted defendant's request for a suppression hearing on the admissibility of his statements to police. A Huntley hearing was held on September 15, 2017, at which defense counsel cross-examined the People's witness. At the end of the testimony on that date, defense counsel confirmed that he needed to review one of the People's exhibits with defendant before deciding whether to put forth any evidence, and the hearing was adjourned accordingly. A new attorney was subsequently assigned to represent defendant [FN2] and, during a November 13, 2017 appearance, revealed that she did not wish to introduce any evidence for the continuation of the Huntley hearing and defendant confirmed that he did not wish to testify. After defense counsel made an argument in support of suppression, County Court denied the motion, subject to certain redactions, finding defendant's statements to law enforcement to be admissible.
A jury trial ensued, following which defendant was convicted of burglary in the second degree. County Court denied defendant's CPL 330.30 motion to set aside the verdict and the People filed a second felony offender statement. Based upon information as to defendant's extensive criminal history that was revealed during a March 2018 appearance on the second felony offender statement, County Court ordered a hearing to determine whether defendant should be sentenced as a persistent felony offender. Following such a hearing, County Court sentenced defendant, as a persistent felony offender (see Penal Law § 70.10 [2]), to a prison term of 15 years to life. Defendant appeals.
Defendant contends that County Court erred in denying the branch of his CPL 330.30 motion seeking to set aside the [*2]verdict on the ground that the amended indictment cited an incorrect Penal Law provision. CPL 330.30 (1) permits a trial court to set aside or modify a verdict at any time prior to sentencing "upon . . . [a]ny ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court" (see People v Bombard, 159 AD3d 1119, 1120 [2018], lv denied 31 NY3d 1145 [2018]). To the extent preserved, defendant's challenge to the amended indictment is unavailing. Although the original indictment erroneously denominated the crime charged as Penal Law § 145.25 (2) — which pertains to reckless endangerment of property — the People cited the Penal Law provision pertaining to burglary in the second degree during defendant's arraignment, County Court noted that defendant was being arraigned on that charge and defendant revealed his awareness of being charged with that crime. Notwithstanding that the handwritten notation amending the indictment also cited an incorrect Penal Law provision, the face of the indictment stated that defendant was being charged with burglary in the second degree and alleged facts constituting all of the elements of that crime. In these circumstances, the typographical errors amounted to mere technical defects that neither changed the theory of the People's case nor constituted jurisdictional impediments requiring reversal (see People v Jackson, 128 AD3d 1279, 1279-1280 [2015], lv denied 26 NY3d 930 [2015]; People v Garcia, 79 AD3d 1248, 1249 [2010], lv denied 16 NY3d 797 [2011]).
Nor did County Court err in denying the branch of defendant's CPL 330.30 motion seeking to set aside the verdict as legally insufficient. When reviewing a jury verdict for legal sufficiency, this Court is required "to determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the finder of fact on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Bombard, 159 AD3d at 1120 [internal quotation marks, brackets and citations omitted]; see People v Rudge, 185 AD3d 1214, 1215 [2020], lv denied 35 NY3d 1070 [2020]). As pertinent here, "[a] person is guilty of burglary in the second degree when he [or she] knowingly enters or remains unlawfully in a building with intent to commit a crime therein, and when . . . [t]he building is a dwelling" (Penal Law § 140.25 [2]). A dwelling means "a building which is usually occupied by a person lodging therein at night" (Penal Law § 140.00 [3]). The People are not typically required to demonstrate the precise crime that the defendant intended to commit to support a burglary conviction (see People v Lewis, 5 NY3d 546, 552 [2005]; People v Brown, 251 AD2d 694, 695-696 [1998], lv denied 92 NY2d 1029 [1998]). However[*3], where, as here, "the People particularize . . . the precise crime that the defendant intended to commit" — in this case, larceny — the People will be held to that theory (People v Edmonds, 165 AD3d 1494, 1495 [2018]; see People v Barnes, 50 NY2d 375, 379 n 3 [1980]).
At trial, a long-term resident of the inn (hereinafter the victim) testified that she was renting two rooms on November 6, 2016 — room 109 (which she used as her living quarters) and room 107 (where she stored personal belongings). Upon entering room 107 around 10:00 a.m., the victim found it in "disarray," with her clothes, purses and suitcases missing. The victim reported the theft to the inn manager, testifying that no other person was staying in either of her rooms and she had not given anyone permission to enter. In response, the manager reviewed surveillance video from the morning of November 6, 2016. When asked to describe the surveillance footage at trial, the manager explained that an internal camera captured an individual exit room 107 on the morning in question, then proceed down a hallway and enter a communal bathroom, and thereafter walk around the building. The manager identified that individual as defendant, explaining that he was familiar with defendant because he had stayed at the inn on several prior occasions. The manager clarified that defendant was not a guest of the inn on the date in question and "did not belong" in room 107.
The People also published to the jury a portion of the surveillance footage from November 6, 2016, which shows the following. At approximately 5:34 a.m., an outside camera captures an individual with light colored sneakers walking towards a light near a window at the rear of the inn. Around 6:15 a.m., the camera depicts items being dropped from the same window to the ground outside. Approximately three minutes later, a camera inside of the inn captures an individual with light colored sneakers exit a room — identified by the manager as room 107 — into the hallway, with what appears to be a bath towel or a white shirt on his head as if to obstruct his face. The individual looks down the hallway and enters a room — identified by the manager and a detective as a communal bathroom. At around 6:34 a.m., an individual wearing the same clothing exits the bathroom — this time without anything draped over his head. A camera in the lobby of the inn then captures the same individual walk through the lobby and up a flight of stairs. Thereafter, around 6:38 a.m., a camera depicts the individual exit the inn and pick up certain items that had been dropped from the room 107 window. A different camera later captures this individual rolling a suitcase away from the inn and carrying another bag in his other hand.
A detective who watched the surveillance video identified defendant as the individual depicted, explaining that he had known defendant for years prior to the incident. The detective revealed that, in viewing the footage, he was [*4]able to determine that the point of entry was through "a back window at the rear of the hotel," which he described as either room 107 or 109. The People also entered into evidence a video of defendant's investigatory questioning after the incident, during which defendant noted that he had previously stayed at the inn but denied having stolen anything. When confronted with the fact that the surveillance video showed him rolling a suitcase away from the inn, defendant stated that another individual — the front desk attendant — had given him the luggage in exchange for crack. Notably, however, the front desk attendant testified that he had not given any property to defendant on November 6, 2016 and never gave him a key to enter room 107 that morning.
Viewing the evidence in a light most favorable to the People (see People v Agudio, 194 AD3d 1270, 1271 [2021]; People v Rudge, 185 AD3d at 1215), we conclude that "there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of [burglary in the second degree, based upon a theory of larcenous intent] proved beyond a reasonable doubt" (People v Reed, 22 NY3d 530, 534 [2014] [internal quotation marks and citations omitted]; see People v Cole, 162 AD3d 1219, 1224 [2018], lv denied 32 NY3d 1002 [2018]; People v Rosa, 47 AD3d 1009, 1010 [2008], lv denied 10 NY3d 816 [2008]). Defendant's identity as the individual depicted in the surveillance video was confirmed by two independent witnesses, both of whom were familiar with defendant. Although the surveillance footage did not clearly show defendant enter the inn through the window of room 107, his other actions on the video, coupled with the testimony that he was not authorized to be at the inn on the date in question, support a rational inference of unlawful entry. Moreover, the surveillance video showed items being dropped outside through the room 107 window and, shortly thereafter, defendant was shown exiting a room, which was identified by the general manager as room 107. This evidence, coupled with the footage of defendant rolling a suitcase away from the inn that generally matched the description given by the victim, renders the verdict legally sufficient.
Defendant's challenge to the composition of the jury panel is unpreserved. Such challenge must be made by written motion prior to jury selection (see CPL 270.10 [2]; People v Parks, 41 NY2d 36, 40-41 [1976]; People v Consolazio, 40 NY2d 446, 455 [1976]), and defendant made only an oral application within the statutory time frame. The "unique circumstances" under which waiver of the written motion requirement may be appropriate are not present in this case (People v Parks, 41 NY2d at 40-41).
We also find unavailing defendant's claims of ineffective assistance of trial counsel. Defendant's contention that his third attorney deprived him of meaningful representation in "waiving" the continuation of the Huntley hearing lacks merit. The [*5]record establishes that a Huntley hearing was held, defendant was afforded meaningful representation thereat and defense counsel confirmed that she did not wish to present any evidence and that defendant declined to testify (see People v Forney, 183 AD3d 1113, 1116, 1118 [2020], lv denied 35 NY3d 1065 [2020]; People v Santos-Rivera, 86 AD3d 790, 791 [2011], lv denied 17 NY3d 904 [2011]). To the extent that defendant's argument is premised upon an allegation that counsel inappropriately waived the continuation of the hearing in the absence of receiving relevant evidence from the People, he concedes that the record "is silent" on this issue. Accordingly, a CPL article 440 motion is the proper vehicle by which to raise such contention (see People v Gumbs, 182 AD3d 701, 703 [2020], lv denied 35 NY3d 1066 [2020]).
Equally unavailing is defendant's challenge to the second felony offender statement on the basis that it failed to specify whether his predicate felony conviction was for a violent offense. Under CPL 400.21 (2), where the People seek to sentence a defendant as a second felony offender, they must file a statement before the imposition of sentence that, as relevant here, "set[s] forth the date and place of each alleged predicate felony conviction and whether the predicate felony conviction was a violent felony as that term is defined in [Penal Law §] 70.02." Prior to sentencing, the People filed a second felony offender statement alleging that defendant had been convicted of criminal sale of a controlled substance in the third degree in 2008. Although the statement failed to specify that such predicate conviction was not one of the violent felonies set forth in Penal Law § 70.02 (see CPL 400.21 [2]), the technical violation of the statute is harmless and, in any event, the statutory requirements of CPL 400.21 were substantially complied with (see People v Ruffin, 42 AD3d 582, 582 [2007], lv denied 9 NY3d 881 [2007]).
With respect to County Court's determination to sentence defendant as a persistent felony offender, defendant does not directly argue that the court abused its discretion in that respect. Rather, he contends that he was prejudiced by the People's reference to his prior felony and misdemeanor convictions during the March 2018 appearance on the second felony offender statement, which he claims formed the basis of County Court's decision to hold a persistent felony offender hearing. This specific argument is without merit. During the March 2018 appearance on the second felony offender statement, the People provided a certificate of conviction for defendant's 2008 conviction of criminal sale of a controlled substance in the third degree, a class B felony (see Penal Law § 220.39), which was received in evidence without objection. The People then urged County Court to sentence defendant to a 15-year prison term as a second felony offender and referenced defendant's substantial criminal history of "over 30 criminal convictions[*6]," including the 2008 felony conviction and a 2003 felony conviction from New Jersey for endangering the welfare of children (see NJ Stat. Ann § 2C: 24-4). Based in part upon these representations, as well as the information contained in the presentence investigation report, the court set the matter down for a hearing to determine whether defendant should be sentenced as a persistent felony offender. Contrary to defendant's contentions, the People were permitted to address his criminal history in support of the sentence for which they were advocating, and such information was relevant to an assessment of whether to schedule a persistent felony offender hearing (see generally CPL 400.20 [2]; People v Sailor, 65 NY2d 224, 234 [1985], cert denied 474 US 982 [1985]).
That said, we are troubled by other aspects of the posttrial proceedings, which cast serious doubt on the fairness of County Court's decision to sentence defendant as a persistent felony offender. The persistent felony offender hearing was held on the morning of September 7, 2018. By this point, the attorney who represented defendant at the March 2018 hearing had been relieved of her duties and a fourth attorney was assigned to represent defendant. The proceeding began with County Court instructing the People to call their first witness. Before doing so, defendant's counsel quickly requested an opportunity to address "some issues." At this juncture, the court twice advised defendant to be seated or he would be removed from the courtroom and defendant was, in fact, removed from the courtroom. Without further record comment from anyone as to the removal, defendant's counsel requested an adjournment, indicating that he had yet to receive the requested trial transcripts. Counsel then advised the court that defendant did not want his assistance and inquired as to whether the court would remove him as counsel. The matter proceeded forward. After a court officer advised that defendant had requested to speak with his attorney, a brief recess was called. When the hearing resumed, defendant was in attendance but informed the court that he preferred to leave. The court asked for an explanation and defendant stated his view that his constitutional rights were being violated and he was illegally incarcerated. Defendant then stated, "And for me to restrain my tongue and not to lash out, I don't want to participate for this hearing." He concluded by stating that counsel was "competent enough" to handle the hearing. The hearing then proceeded in defendant's absence. After the People presented certified documentation of defendant's 2003 felony conviction in New Jersey and his numerous other misdemeanor convictions, the court determined that defendant was a persistent felony offender and scheduled sentencing for later in the afternoon.
When the proceedings resumed, County Court inquired of defense counsel as to whether there was any legal reason sentencing should not proceed. Counsel [*7]flippantly responded, "Beyond the non-cooperation of my client and my ability to be prepared for this, no, Your Honor." The court then inquired of defendant whether he would like to take a seat at counsel's table or remain on a bench. Defendant declined to move. After the People addressed sentencing and defense counsel began his response, defendant interceded, asking counsel to desist and indicating that he wished to speak for himself and was invoking his "[S]ixth [A]mendment." When the court advised defendant that it would disregard his request, the situation rapidly deteriorated and defendant, who is black, charged the court with being motivated by race. The exchange continued, prompting the court to direct court personnel, three times, to bind defendant's mouth with masking tape. That dire directive was, fortunately, not implemented and defense counsel completed his comments.
County Court then offered defendant an opportunity to speak and defendant proceeded to challenge the proceedings as racially biased. While we are mindful that defendant's actions were at times disruptive during these sentencing hearings and his commentary included inappropriate vulgarities, we are deeply troubled by the court's response. The court, practically right out of the gate, stated, "[Defendant], I feel sorry for you. Because I know that if we were to look in your mind we would find that your brain, your frontal lobes, your decision making processes are probably retarded in growth." The court then inexplicably and shockingly reiterated, "Because we have learned through medicine, through science, that physical mental abuse especially at a young age will stunt the growth of the frontal lobes which prevents people from making decisions." The court finally reinforced its own beliefs when it stated, "[T]he sentence here is in a way to make you safe from hurting yourself or others, because I appreciate the fact that your brain is not developed, through no fault of your own."
In fashioning an appropriate sentence, the trial court is required to weigh and consider societal protection, rehabilitation and deterrence, as well as the circumstances that gave rise to the conviction" (People v Lanfair, 18 AD3d 1032, 1034 [2005] [citations omitted], lv denied 5 NY3d 790 [2005]). Factors that have zero role in this process are the skin color of the defendant and racist views — a premise that should not have to be explicitly stated. The commentary focusing on defendant's brain growth mimics 19th century polygenism, a racist ideology that focused on the claimed inferiority of black people based upon now debunked theories of reduced brain size (see M. Bennett & V. Plaut, Looking Criminal and the Presumption of Dangerousness: Afrocentric Facial Features, Skin Tone, and Criminal Justice, 51 U.C. Davis L. Rev. 745 [2018]; Andrew S. Winston, Scientific Racism and North American Psychology, May 29, 2020, Oxford Research Encyclopedia of Psychology, available at https://oxfordre[*8].com/psychology/view/10.1093/acrefore/
9780190236557.001.0001/acrefore-9780190236557-e-516; Robert Bennett Bean, Some Racial Peculiarities of the Negro Brain, American Journal of Anatomy, 411-412 [1906]). It is shocking that any court, in 2018, would refer to this black defendant's brain, frontal lobes and retardation of growth in concluding that defendant's brain was not developed. Defendant is not a child or an adolescent, but was a 41-year-old grown black man at the time of sentencing. County Court's statements are textbook language that has been used since the late 19th century and even today to justify racist ideologies and beliefs that black people are an inferior race. We find the court's commentary dehumanizing and offensive. To invoke such reasoning today is utterly racist and has no place in our system of justice. The record reflects that the court's comments were made unabated and without objection. The most vehement objection, however, could not undo, alleviate or minimize the travesty that the court drew from a widely discredited theory when sentencing defendant. Not to be overlooked is the court's abrupt draconian order to have defendant's mouth bound with masking tape. The court's remarks cannot be condoned or countenanced.
As for defendant's attempt to invoke his Sixth Amendment right to dismiss counsel and speak for himself, we recognize that an application to proceed pro se at this late stage of the proceedings is severely limited, but such a request may be granted in the exercise of the court's discretion (see People v Crespo, 32 NY3d 176, 184-185 [2018], cert denied ___ US ___, 140 S Ct 148 [2019]; People v McIntyre, 36 NY2d 10, 17 [1974]). The court's response here was to advise defendant, "I heard you. But you know what? I am not going to follow your advice," prompting defendant to respond, "Of course you are not going to follow my rights . . . I am nothing to you," followed by charges of racism. Given the volatile nature of these exchanges, it is also difficult to correlate the court's final recommendation to "the Department of Parole and Department of Corrections" that defendant "be housed in a maximum security prison . . . [and] not be paroled at all," with the court's final comment directed at defendant to "[h]ave a nice day."
We note that judges are held to "high standards of conduct . . . so that the integrity and independence of the judiciary will be preserved" (Rules Governing Judicial Conduct [22 NYCRR]
§ 100.1). Indeed, "[a] judge shall perform judicial duties without bias or prejudice against or in favor of any person
. . . and shall not, by words or conduct, manifest bias or prejudice, including but not limited to based upon . . . race,
. . . color [or] national origin" (Rules Governing Judicial Conduct [22 NYCRR § 100.3 [B] [4]). Additionally, "[a] judge shall be patient, dignified and courteous to litigants . . . with whom the judge deals in an official capacity" (Rules Governing Judicial Conduct [*9][22 NYCRR] § 100.3 [B] [3]). That said, we are left with serious concerns as to the fairness of the sentencing proceedings and the harshness of the sentence imposed and find it necessary to vacate the sentence, as well as the persistent felony offender adjudication, in the interest of justice (see CPL 470.15 [2] [c]; [3] [c]; [6] [b]). Under the circumstances presented, we have determined that it is appropriate to sentence defendant, as a second felony offender, to a prison term of five years (see Penal Law § 70.06 [6] [b]; see generally CPL 470.20 [6]), with five years of postrelease supervision (see Penal Law § 70.45 [2]). In light of our determination, defendant's remaining contentions are academic.
Clark, Aarons and Colangelo, JJ., concur.
ORDERED that the judgment is modified, as a matter of discretion in the interest of justice, by vacating the sentence imposed; defendant is sentenced, as a second felony offender, to a prison term of five years, to be followed by five years of postrelease supervision; and, as so modified, affirmed.



Footnotes

Footnote 1: The portion of defendant's motion seeking dismissal of the indictment was based upon alleged defects in the grand jury proceedings, not the incorrect Penal Law citation contained in the amended indictment.

Footnote 2: Defendant was represented by four different attorneys throughout these proceedings.